EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| José Córdova Iturregui y Otros<br><br>    Peticionarios<br><br>        vs.<br><br>Cámara de Representantes del Estado Libre Asociado de Puerto Rico y Otros<br><br>    Recurridos<br><br>Raquel del Valle (Desistió) y Otros<br><br>    Peticionarios<br><br>        vs.<br><br> Francisco González Rodríguez Y Otros<br><br>    Recurridos | Certiorari<br><br>2007 TSPR 133<br><br>171 DPR _____ |

Número del Caso: CC-2007-350
        Cons. CC-2007-361

Fecha: 29 de junio de 2007

Tribunal de Apelaciones:

                Región Judicial de San Juan/Humacao, Panel V

Juez Ponente:

                Hon. Lourdes Velásquez Cajigas

Abogados de la Parte Peticionaria:

                Lcdo. Héctor M. Collazo Maldonado
                Lcdo. José A. Rodríguez Jimenez

Abogados de la Parte Recurrida:

                Lcdo. Ángel J. Vargas Carcaña
                Lcdo. Kevin Miguel Rivera-Medina
                Lcdo. Richard W. Markus
                Lcdo. Manuel D. Herrero
                Lcdo. Carlos E. Pérez Acosta

Colegio de Abogados de Puerto Rico:

                Lcdo. Marcos A. Ramírez Lavadero
                Lcdo. José Luis González Castañer

Materia: Violación de Derechos Civiles

        Este documento constituye un documento oficial del Tribunal
        Supremo que está sujeto a los cambios y correcciones del
        proceso de compilación y publicación oficial de las
        decisiones del Tribunal. Su distribución electrónica se
        hace como un servicio

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

José Córdova Iturregui y Otros   *

  *

   Peticionarios                *

  *

      vs.                   *     CC-2007-350

  *

  *

Cámara de Representantes del    *

Estado Libre Asociado de       *

Puerto Rico y Otros         *

  *     Certiorari

   Recurridos              *

********************************

Raquel del Valle (Desistió)    *

y Otros                   *

  *     Consolidados

   Peticionarios           *

  *

      vs.                   *     CC-2007-361

  *

Francisco González Rodríguez   *

y Otros                   *

  *

   Recurridos              *

********************************

Opinión del Tribunal emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico, a 29 de junio de 2007.

El caso ante nuestra consideración requiere que resolvamos si los tribunales pueden ordenarle a la Asamblea Legislativa que inicie el proceso para enmendar la Constitución del Estado Libre Asociado de Puerto Rico a los fines de que la Rama Legislativa esté constituida por una sola cámara, luego de que el electorado favoreció el modelo unicameral en el referéndum celebrado el 10 de julio de 2005. En específico, requiere que determinemos si es exigible judicialmente el mandato dispuesto en la Ley Núm.

477 del 23 de septiembre de 2004, denominada "Ley del Referéndum sobre el Sistema Cameral de la Asamblea Legislativa".

Para ello, debemos repasar los postulados fundamentales de nuestro sistema republicano de gobierno. Asimismo, debemos examinar el procedimiento que contempla nuestro ordenamiento constitucional para enmendar la Constitución del Estado Libre Asociado de Puerto Rico. Finalmente, nos corresponde interpretar el alcance y validez del mandato recogido en la Ley Núm. 477, para resolver, en última instancia, la procedencia del *mandamus* a la luz de los principios discutidos.

Al examinar la referida Ley Núm. 477 a la luz del Artículo VII, Sección 1 de nuestra Constitución, el cual delega en la Asamblea Legislativa la decisión de iniciar el proceso de enmienda constitucional, concluimos que la misma es contraria a dicha disposición toda vez que establece un proceso de enmienda ajeno tanto a la letra como al espíritu de nuestro ordenamiento. En vista de ello, resolvemos que el mandato allí establecido resulta inoficioso y, por ende, no se puede exigir judicialmente.

I.

La Decimocuarta Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 477 del 23 de septiembre de 2004, denominada "Ley del Referéndum sobre el Sistema Cameral de la Asamblea Legislativa" (en adelante, Ley Núm. 477) con el fin de celebrar un referéndum en el Estado Libre Asociado de Puerto Rico en el que los electores pudiesen expresar si

preferían mantener una Asamblea Legislativa bicameral o cambiar a un sistema unicameral. Dicho proyecto no incluía enmiendas específicas a la Constitución, pero se dispuso que de favorecerse un sistema unicameral se celebraría un segundo referéndum en el cual se propondrían las enmiendas constitucionales necesarias para cambiar a un sistema unicameral.

Celebrado el Referéndum el 10 de julio de 2005, resultó victoriosa –con un 83.8% de los votos emitidos– la alternativa de la unicameralidad. Por tanto, no hay controversia en cuanto a que la mayoría del electorado que se expresó mediante dicho proceso electoral prefiere que la Asamblea Legislativa inicie el proceso para enmendar la Constitución de tal forma que dicha rama se componga de una sola cámara.

Posteriormente, y como consecuencia del resultado de dicha consulta, el Senado de Puerto Rico aprobó con dos terceras partes de sus miembros un proyecto de resolución en el cual se estableció una propuesta de enmienda a la Constitución con el fin de establecer el sistema unicameral. Dicho proyecto proponía enmiendas específicas a la Constitución que, de ser aprobadas por la Cámara de Representantes, serían sometidas para la consideración del electorado en una elección especial a ser celebrada posteriormente. Dicho proyecto se descargó en la Cámara de Representantes pero no obtuvo los votos de las dos terceras partes de los miembros de esa Cámara necesarios para su

aprobación. Allí terminó cualquier intento de enmienda a nuestra Constitución.

En vista de ello, el 14 de noviembre de 2006, un grupo de ciudadanos presentó un auto de *mandamus* y Sentencia Declaratoria ante el Tribunal de Primera Instancia en contra de la Cámara de Representantes y el Senado de Puerto Rico. Solicitaron la intervención de los tribunales para poner en vigor el mandato contenido en la Ley Núm. 477 y así exigir a la Rama Legislativa que aprobara las enmiendas necesarias para viabilizar el establecimiento del sistema unicameral en Puerto Rico. Posteriormente, otro grupo de ciudadanos presentó idéntica reclamación, por lo que ambos recursos fueron consolidados (en adelante, haremos referencia a todos los demandantes como "los peticionarios").

Tanto la Cámara de Representantes como el Senado de Puerto Rico comparecieron a oponerse mediante una moción de desestimación. Alegaron que el mandato recogido en la Ley Núm. 477 atenta contra nuestro sistema republicano de gobierno y la separación de poderes. Asimismo, sostuvieron que la doctrina de inmunidad parlamentaria impide que los tribunales puedan intervenir en este asunto.

Eventualmente, el Colegio de Abogados de Puerto Rico solicitó intervenir como *amicus curiae*, a lo que accedió el Tribunal de Primera Instancia. En su comparecencia, dicha organización argumentó que existe una obligación de la

Cámara de Representantes de someter enmiendas constitucionales al pueblo.[1]

Luego de los trámites procesales de rigor, el tribunal de instancia desestimó el recurso de los peticionarios por entender que la controversia ante su consideración no es susceptible de revisión judicial. Concluyó que el mandato recogido en la Ley Núm. 477, *supra*, no es auto-ejecutable toda vez que depende de acciones legislativas posteriores. Por tanto, resolvió que el recurso de *mandamus* no procede en derecho para atender un asunto en el cual el legislador tiene amplio margen de discreción.

Inconformes con la Sentencia emitida por el Tribunal de Primera Instancia, los peticionarios sometieron recursos separados ante el Tribunal de Apelaciones. Dicho foro consolidó ambos recursos y autorizó al Colegio de Abogados a intervenir nuevamente como amigo de la corte. Examinadas las comparecencias de todas las partes, el Tribunal de Apelaciones confirmó la Sentencia del foro de instancia tras concluir que el proceso contemplado en la Ley Núm. 477, *supra*, es contrario a lo dispuesto en la Constitución y, además, que la inmunidad parlamentaria impide a los tribunales poner en vigor el mandato recogido en la referida ley.

---

[1]En su comparecencia, el Colegio de Abogados plantea que el Art. VII no agota las posibles maneras de enmendar la Constitución. Por otro lado, sostiene que, una vez se somete un asunto mediante referéndum al voto directo del pueblo y prevalece cierta opción, las cámaras legislativas están obligadas por ese resultado y están obligadas a actuar de conformidad con el mismo.

De esta sentencia los peticionarios acuden ante nos mediante dos recursos separados[2]. En esencia, aducen que erró el Tribunal de Apelaciones al negarse a ordenar a la Asamblea Legislativa a que inicien el proceso de enmendar la Constitución. Sostienen que no es de aplicación la doctrina de cuestión política ni la de inmunidad parlamentaria, por lo que erró al resolver que el asunto no era justiciable. Arguyen, además, que erró el foro intermedio al sostener que el concepto de democracia representativa adoptado en nuestra Constitución impide que la Rama Legislativa se comprometa con el pueblo a acatar el resultado de una consulta electoral sobre el inicio de un proceso de enmienda a la Constitución del E.L.A.[3]

---

[2] El primer recurso fue presentado el 2 de mayo de 2007. Dos días después, el 4 de mayo de 2007, se presentó el otro recurso.

[3] En específico, en el recurso CC-2007-361 se planteó la comisión de los siguientes errores:

> Erró el Tribunal de Apelaciones al resolver que la Constitución de E.L.A. al adoptar el concepto de democracia representativa impide que la Asamblea Legislativa consulte al Pueblo sobre su deseo de iniciar un procedimiento de enmienda constitucional en virtud del artículo VII, sección I de la Constitución. Así también que en la ley que promueve la consulta se pueda legislar un mandato donde el poder legislativo se comprometa con el Pueblo a acatar el resultado electoral.

> Erró el Tribunal de Apelaciones al resolver que la inmunidad Parlamentaria prohíbe que los legisladores sean judicialmente sancionados mediante un recurso de desacato por no cumplir con un mandato electoral validamente emitido en las urnas por el pueblo de Puerto Rico. Al así resolver niega el recurso de Mandamus, que es el único

Ordenamos la consolidación de las peticiones y le concedimos a todas las partes un término para exponer sus respectivas posiciones sobre la controversia de autos[4]. Cumpliendo con lo ordenado, el Senado de Puerto Rico compareció el 7 de junio y la Cámara de Representantes el 11 de junio de 2007. El caso quedó sometido para su resolución el 12 de junio de 2007. Sin ulterior trámite y a tenor con lo dispuesto en la Regla 50 del Reglamento del Tribunal Supremo, resolvemos.

## II.

### A.

Como es sabido, en Puerto Rico se adoptó un sistema republicano de gobierno compuesto de tres poderes separados, a saber; la Rama Ejecutiva, la Rama Legislativa

_____

remedio judicial disponible para los demandantes.

De otra parte, los peticionarios que comparecieron en el recurso CC-2007-350 sostuvieron que:

> Erró el Tribunal de Apelaciones al confirmar la sentencia dictada por el Tribunal de Primera Instancia quien desestimó la demanda del presente caso basándose en que el asunto planteado no era justiciable por ser una cuestión política.

> Incurrió en grave error de derecho el Tribunal de Apelaciones al negarse a validar el resultado electoral del referéndum del 10 de julio de 2005 y resolver que la inmunidad parlamentaria invocada por los demandados estaba por encima de la soberanía del pueblo y del mandato popular expresado mediante sufragio universal de la ciudadanía.

[4] El 18 de mayo de 2007 emitimos una Resolución concediéndole treinta (30) días a las partes para que presentaran sus alegatos. Posteriormente, el 5 de junio de 2007, modificamos dicho término y les concedimos hasta el 11 de junio de 2007 para comparecer.

y la Rama Judicial. Así lo establece el Artículo I, Sección 2 de nuestra Constitución:

> El gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establece por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico. 1 L.P.R.A., Tomo I.

La coexistencia de estas ramas de gobierno provee un sistema de pesos y contrapesos que tiene como fin generar un equilibrio dinámico entre poderes coordinados y de igual rango y, así, evitar la concentración de poder en uno de ellos. Misión Industrial de P.R. v. Junta de Planificación, 146 D.P.R. 64 (1998). Asimismo, protege la libertad de los ciudadanos y evita que una de las ramas amplíe su autoridad a expensas de las otras. *Id*; Acevedo Vilá v. Meléndez Ortiz, res. el 7 de junio de 2005, 2005 TSPR 79.

La teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre esas tres ramas. Silva v. Hernández Agosto, 118 D.P.R. 45 (1986). Esta división tripartita conlleva una delegación constitucional de funciones. De esta forma, la Constitución no sólo proveyó un esquema de separación de poderes sino que dispuso el ámbito de acción de cada uno.

Conforme a lo anterior, se ha desarrollado la doctrina de separación de poderes con el fin de salvaguardar la independencia de cada rama de gobierno. Acevedo Vilá v. Meléndez Ortiz, *supra*; Colón Cortés v. Pesquera, 150 D.P.R. 724 (2000). Ello resulta fundamental para nuestro esquema

democrático de gobierno, por lo que no constituye una mera conveniencia o mecanismo de organización gubernamental. Véase, Colón Cortés v. Pesquera, *supra,* citando a United Workers v. Mitchell, 330 U.S. 75, 91 (1947). Por consiguiente, debemos ser fieles a dicha normativa.

No obstante, conviene aclarar que la doctrina de separación de poderes no supone una separación absoluta de funciones, sino una relación dinámica y armoniosa en la que cada rama acepta y respeta la autoridad de las otras así como la interrelación de sus funciones. *Id*.; Sánchez v. Secretario de Justicia, res. el 28 de junio de 2002, 2002 TSPR 98.

Como corolario de la doctrina de separación de poderes, y en aras de respetar el radio de acción de cada rama de gobierno, este Tribunal ha desarrollado una doctrina de auto-limitación judicial. Al amparo de dicha doctrina, hemos establecido que la Rama Judicial no intervendrá en determinada controversia cuando se trata de resolver una cuestión política; cuando una de las partes no tiene capacidad jurídica para promover un pleito; cuando después de comenzado un pleito, hechos posteriores lo convierten en académico; cuando las partes buscan obtener una "opinión consultiva", o cuando se promueve un pleito que no está maduro. Noriega v. Hernández Colón, 135 D.P.R. 406 (1994).

En lo pertinente al caso que nos ocupa, la doctrina de cuestión política impide la revisión judicial de asuntos que fueron delegados a las otras ramas políticas del

gobierno o, en última instancia, al electorado. <u>P.P.D. v. Rosselló González</u>, 136 D.P.R. 916 (1994); <u>Noriega Rodríguez v. Jarabe</u>, 136 D.P.R. 497 (1994). Específicamente, en <u>Noriega v. Hernández Colón</u>, *supra*, establecimos que un asunto no es justiciable, o susceptible de adjudicación judicial, por plantear una cuestión política cuando: (1) éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno; (b) no existan criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, o bien por la presencia de otros factores análogos, y (c) existen consideraciones derivadas de la prudencia.

En síntesis, la doctrina de cuestión política limita nuestra intervención judicial en asuntos que claramente son de la injerencia de las ramas políticas del Gobierno. Reiteramos que se trata de una restricción inherente a la división tripartita de nuestro sistema republicano. <u>Acevedo Vilá v. Meléndez Ortiz</u>, *supra*.

Ahora bien, la Rama Judicial tiene el poder de determinar si las otras ramas del gobierno observaron las limitaciones constitucionales y si los actos de una de éstas exceden sus poderes delegados. <u>Silva v. Hernández Agosto</u>, *supra*. Ello significa que los tribunales podemos precisar las funciones correspondientes a las distintas ramas de gobierno, pero no inmiscuirnos en ellas. En vista de ello, si las actuaciones del Poder Legislativo están dentro del marco constitucional y corresponden exclusivamente a sus poderes delegados, debemos ser

deferentes y restringir nuestra intervención en lo que respecta a ese asunto.

Aclarado lo anterior, y a la luz de la doctrina de cuestión política, debemos determinar únicamente a cuál de las ramas corresponde decidir si procede iniciar un proceso de enmienda a la Constitución del E.L.A.

B.

Nuestra Constitución dispuso en forma detallada los mecanismos para viabilizar su modificación en el Artículo VII. Por su importancia, transcribimos *in extenso* la Sección 1 del referido artículo:[5]

> Sección 1- La **Asamblea Legislativa podrá** proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros que se compone casa cámara. **Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial**, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es **ratificada por el voto de la mayoría de los electores que voten sobre el particular**. Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum.

Vemos, pues, que los padres de nuestra Constitución diseñaron un procedimiento de enmienda que: (1) requiere la

---

[5] Concentramos nuestro análisis en el proceso dispuesto en la Sección 1 del Art. VII, toda vez que fue el mecanismo contemplado en la Ley Núm. 477, *supra*.

aprobación de por lo menos dos terceras (2/3) partes de los miembros de cada cámara legislativa; (2) exige que la enmienda sea sometida al electorado en referéndum especial o en una elección general si lo aprueban por lo menos tres cuartas (3/4) partes del número total de los miembros de cada cámara; (3) dispone que cada proposición de enmienda deberá votarse separadamente; (4) limita el número de proposiciones de enmienda a tres (3) en un mismo referéndum; (5) establece que toda enmienda contendrá sus términos de vigencia; (6) requiere el voto afirmativo de la mayoría de los electores que voten sobre el particular, y (7) exige que la proposición de enmienda sea publicada por lo menos noventa (90) días antes del referéndum. Berríos Martínez v. Rosselló González, 137 D.P.R. 195 (1994).

**Evidentemente, mediante dicha normativa se estableció un procedimiento lo suficientemente rígido como para impartirle estabilidad a la Constitución y distinguirla de las leyes ordinarias.** *Id*. **De esta forma, se establecieron límites explícitos al proceso de enmendar la Constitución.** *Id*. **Recordemos que "las constituciones deben estar fuera del alcance de la pasión súbita y el juicio pasajero y, siendo tan alto el fin que ellas cumplen, el procedimiento para enmendarlas debe ser lo suficientemente difícil como para invitar al análisis sereno y cuidadoso."** *Id*.

Del proceso antes descrito, enfatizamos en la exigencia de que debe originarse por **iniciativa de la Asamblea Legislativa**. Ortiz Angeleró y Otros v. Barreto Pérez, 110 D.P.R. 84 (1980), Op. Concurrente emitida por el

Juez Asociado señor Negrón García.   El Artículo VII,
Sección 1, contiene una delegación expresa mediante la cual
corresponde a la Asamblea Legislativa la facultad de
decidir proponer enmiendas al electorado.   En otras
palabras, la decisión de si se debe o no enmendar la
Constitución del E.L.A. radica en la Asamblea Legislativa.

**Al disponer que "la Asamblea Legislativa <u>podrá</u>
proponer enmiendas al electorado", inevitablemente debemos
concluir que se trata de una facultad <u>discrecional</u> del
Poder Legislativo. Por ende, la decisión de iniciar un
proceso formal de enmienda a nuestra Ley Suprema recae, por
mandato constitucional, <u>exclusivamente</u> en la Rama
Legislativa.**[6]

C.

Ahora bien, los peticionarios plantean que, al aprobar
la Constitución, el pueblo de Puerto Rico se reservó el
derecho de participar en un procedimiento de consulta que

---

[6] La experiencia norteamericana ha sido la misma. En
<u>Coleman v. Miller</u>, 307 U.S. 433 (1939), se dijo que el
Congreso tiene un poder exclusivo sobre el proceso de
enmienda a la Constitución de los Estados Unidos. En
particular, se resolvió que dicho proceso presenta
condiciones que lo hacen propio para la consideración por
las ramas políticas del gobierno por lo que se trata de un
asunto no justiciable.

Asimismo, hay consenso en la doctrina en cuanto a que
el proceso de enmienda a la Constitución radica en el
ámbito de poder de la Rama Legislativa. Así, por ejemplo,
se ha expresado lo siguiente: "Constitutional amendment is
a political, not legal, process, and judicial supervision
of that process threatens to undermine the independence of
Art. V from normal legal processes–**and poses particular
problems when the amendment at issue is one proposed in
response to judicial decisions.** (Énfasis suplido). Laurance
Tribe, <u>American Constitutional Law</u>, New York, 2000, pág.
105.

le hace la Asamblea Legislativa antes de poner en vigor el procedimiento de enmienda dispuesto por el Artículo VII, Sección 1. Además, arguyen que una vez existe un mandato electoral se activan otras disposiciones de la Constitución que obligan a los legisladores a actuar conforme el mandato expresado por el pueblo.

Tales planteamientos sugieren que la facultad de iniciar un proceso de enmienda a la Constitución no es exclusiva de la Asamblea Legislativa, sino que existe un procedimiento implícito –por iniciativa directa del electorado– para enmendar la Constitución. En esencia, de sus argumentos se desprende la posibilidad de enmendar la Constitución por iniciativa popular[7]. Sin embargo, la propia Constitución excluye este mecanismo de enmienda.

Tal como expusimos antes, la decisión de iniciar un proceso de enmienda a la Constitución le corresponde a la Asamblea Legislativa, a tenor con el texto del Artículo VII, Sección 1 de la Constitución, *supra*. Dicha disposición no establece ningún supuesto en el que el cuerpo legislativo esté obligado a comenzar un proceso de enmienda a iniciativa del electorado. Más bien, la participación ciudadana que tiene alguna injerencia en el proceso es <u>posterior</u> a la etapa en que la Asamblea Legislativa,

---

[7] Los tres métodos más corrientes de iniciar enmiendas constitucionales son: por propuesta de la Legislatura, por convención constitucional y por iniciativa popular. Como veremos, los redactores de <u>La Nueva Constitución de Puerto Rico</u> sugirieron adoptar los dos primeros métodos toda vez que entendían que el tercero no era recomendable. <u>La Nueva Constitución de Puerto Rico</u>, Ed. Universidad de Puerto Rico, 2005, pág. 522.

efectivamente, lleva a cabo el acto de proponer enmiendas a la Constitución.

Así se desprende del Artículo VII, Sección 1 en cuanto establece que "[**t]oda <u>proposición</u> de enmienda se <u>someterá a</u> los electores capacitados en referéndum especial**[…]" y en cuanto dispone que "[t]oda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es <u>**ratificada**</u> **por el voto de la mayoría de los electores que voten sobre el particular**"[8]. (Énfasis suplido). En efecto, en <u>Berríos Martínez v. Rosselló González</u>, *supra*, sostuvimos que el propósito principal de ese referéndum especial es "determinar si el cambio **propuesto** a la ley fundamental tiene o no **respaldo** del electorado". (Énfasis suplido). Así, el ciudadano desempeña un papel importante en el **trámite final** de todo proceso de enmienda. <u>La Nueva Constitución de Puerto Rico</u>, Ed. Universidad de Puerto Rico, Pág. 522.

Claramente, el texto de la Constitución excluye el proceso de enmienda mediante consulta directa al pueblo. Según expresamente dispuesto en el Artículo VII, Sección 1, la Asamblea Legislativa primero tiene que aprobar unas enmiendas y, concluido dicho trámite, entonces se somete el texto de la enmienda a votación del electorado.

---

[8] Al indagar sobre la definición de "ratificar" encontramos que se refiere al acto de **"aprobar** o **confirmar** actuaciones, palabras, opiniones, decisiones, decretos y reglamentos, dándolos por legales, valederos y ciertos." <u>Diccionario de Términos Jurídicos</u>, Virginia, Lex Publishing, 2000, pág. 217.

Por otro lado, del <u>Diario de Sesiones de la Convención Constituyente</u> se desprende que los delegados expresamente rechazaron una propuesta del delegado Sr. García Delgado para incorporar un proceso de enmienda por iniciativa popular. El texto propuesto y rechazado disponía que: "una quinta parte o más de los votantes capacitados de Puerto Rico, podrá, mediante petición a la Asamblea Legislativa, solicitar se enmienda [sic] la constitución [sic], estando la [Asamblea] Legislativa obligada a someter la enmienda así propuesta a un referéndum". Tomo 3 del <u>Diario de Sesiones de la Convención Constituyente</u>, pág. 1829.

Para fundamentar dicha propuesta, el Sr. García Delgado sostuvo que "se le debe garantizar [a los] […] electores del pueblo de Puerto Rico […] el poder de solicitar, por lo menos, de la Asamblea Legislativa, que la enmienda sea propuesta y sea sometida en referéndum. Si se está defendiendo en esta constitución [sic] la voluntad del pueblo, no veo cómo esa voluntad del pueblo pueda estar defendida sin un articulado en esta constitución [sic] que le permita a ese pueblo, sin intervención de segundas personas, solicitar directamente, de quien sea pertinente, que se enmiende la constitución [sic] según el deseo de ese número de votantes. *Id*. pág. 1831-1832.

Es evidente que la base de los fundamentos presentados por el delegado Sr. García Delgado es similar a la de los peticionarios. **Sin embargo, dichos fundamentos no fueron endosados por una mayoría de la Convención Constituyente y, por consiguiente, no se incorporó el texto propuesto.**

En su lugar, se adoptó un mecanismo que otorga a la Asamblea Legislativa la facultad de iniciar el proceso de enmienda a la Constitución[9]. Al adoptar este procedimiento, la Convención Constituyente endosó la posición de los delegados señores José Trías Monge y Jaime Benítez. Este último sostuvo que "[…] es particularmente importante que los cuerpos parlamentarios tengan la plenitud de su encomienda y se sepa que se mira hacia ellos para desempeñar la alta responsabilidad que dentro del sistema de la democracia republicana les corresponde; y que, en mi opinión, constituiría un grave error el excluirlos o proveer una mecánica para su exclusión, en el proceso de hacer enmiendas." *Id*.

De lo anterior se colige que durante los debates de la Convención Constituyente se contempló la posibilidad de establecer el mecanismo de enmienda por iniciativa popular, pero que el mismo fue rechazado. Por ende, no podemos endosar la posición de los peticionarios en cuanto sostienen que, de un análisis integral de la Constitución, surge que un reclamo del electorado expresado en un referéndum tiene el efecto de obligar a los legisladores a iniciar el proceso de enmienda.

Ahora bien, conviene aclarar que la Constitución no prohíbe celebrar un referéndum antes de iniciarse el

---

[9] Tal proceder guarda armonía con la opinión de muchos de los autores de las constituciones estaduales quienes, desde 1919, llegaron a la conclusión de que la iniciación de enmiendas constitucionales debe dejarse a la discreción de la Legislatura. La Nueva Constitución de Puerto Rico, Pág. 522.

proceso contemplado en el Artículo VII, Sección 1, *supra*, con el fin de palpar el sentir de la ciudadanía. Lo que contraviene la Constitución es que esa consulta tenga el efecto de obligar a la Asamblea Legislativa a iniciar dicho proceso y, por ende, a proponer determinadas enmiendas al electorado. Ello en vista de que el mecanismo contemplado en la Constitución le concede discreción a la Asamblea Legislativa para iniciar el proceso de enmienda lo cual, sin duda, implica unos límites a la participación ciudadana.[10]

IV.

Aclarado que el mecanismo de enmienda a la Constitución por iniciativa popular no surge del texto del Artículo VII de la Constitución y que, además, el mismo fue expresamente rechazado por la Convención Constituyente, procede analizar el alcance del mandato establecido en la Ley Núm. 477, *supra*, así como su validez a la luz de nuestro ordenamiento constitucional.

Los peticionarios arguyen que la Ley Núm. 477, *supra*, estableció un mandato a la Asamblea Legislativa para que propusieran enmiendas al electorado. En otras palabras, arguyen que la Asamblea Legislativa estaba obligada a acatar la voluntad de la mayoría del electorado en cuanto a si se debía o no iniciar un proceso formal de enmiendas a

---

[10] La participación del pueblo a través del derecho al voto no es absoluta. Toda expresión del electorado está sujeta a las restricciones contenidas en la Constitución. <u>Partido Acción Civil v. Partido Independentista Puertorriqueño</u>, res. el 29 de diciembre de 2006, 2006 TSPR 193. Véase, además, <u>United States v. Classic</u>, 313 U.S. 299 (1941).

la Constitución. Los peticionarios sostienen que en nuestro ordenamiento constitucional impera la ley y no las voluntades individuales, por lo que la Legislatura no puede negarse a obedecer el mandato que surge de esta ley. No tienen razón.

A.

La Ley Núm. 477 se aprobó por la Decimocuarta Asamblea Legislativa para viabilizar la celebración de un referéndum con el fin de consultar al electorado sobre su preferencia en cuanto a mantener un Sistema Bicameral o cambiar a un Sistema Unicameral en la Asamblea Legislativa de Puerto Rico. Según surge de la Exposición de Motivos, la Ley tuvo como propósito proveer los mecanismos para que se consultara en primera instancia al pueblo sobre su preferencia en cuanto a la forma en que se debía ejercer el Poder Legislativo.

En lo pertinente a la controversia que nos ocupa, el Artículo 3 del estatuto en controversia especificó el tipo de información que habría de incluirse en la papeleta a usarse en el referéndum. En específico, se ordenó que se incorporara la siguiente instrucción:

> Un voto a favor del Número 1 [la unicameralidad] significaría un mandato a la Asamblea Legislativa para que se celebre un referéndum el 9 de julio de 2007, con el fin de proponer al electorado que se enmiende la constitución del Estado Libre Asociado de Puerto Rico, de forma tal que a partir del 2 de enero de 2009, la Asamblea Legislativa de Puerto Rico, esté constituida bajo una sola cámara. Significará además, que la propuesta enmienda a la Constitución del Estado Libre Asociado de Puerto Rico, se presentará, mediante el referéndum dispuesto en la

sección 1, del artículo VII, de la constitución y no por lo dispuesto en la sección 2 de dicho artículo.

Asimismo, en el artículo 25 se dispuso que si la Comisión Estatal de Elecciones certificaba que el resultado del referéndum había favorecido el Sistema Unicameral para la Asamblea Legislativa de Puerto Rico, se celebraría un referéndum especial para aceptar o rechazar las proposiciones de enmienda constitucionales **aprobadas por la Asamblea Legislativa** mediante Resolución Concurrente. Ello con el fin de que, a partir del 2 de enero de 2009, se estableciera el Sistema Unicameral en la Rama Legislativa.

De lo anterior se desprende que la Ley Núm. 477, promulgada por la Decimocuarta Asamblea Legislativa, estableció un mandato para que la Decimoquinta Asamblea Legislativa proponga enmiendas al electorado en un referéndum a celebrarse el 9 de julio de 2007. En otras palabras, mediante el mandato allí establecido se pretende obligar a la actual Asamblea Legislativa a iniciar un proceso formal de enmienda a la Constitución. Esto constituye un procedimiento de enmienda obligatorio por iniciativa popular expresamente vedado en nuestro ordenamiento constitucional.

Como vimos anteriormente, recae en la **discreción** de la Asamblea Legislativa el iniciar el proceso de enmienda constitucional establecido en el Artículo VII, Sección 1 de la Constitución. Sin embargo, un análisis integral y minucioso de la Ley Núm. 477, *supra*, nos convence de que

ésta tuvo el efecto de eliminar la aludida discreción.[11]

Mediante dicho estatuto, una Asamblea Legislativa anterior comprometió el voto de –al menos– dos terceras partes de futuros legisladores al establecer un mandato que necesariamente implicaba votar a favor de un proceso de enmienda. Conforme expresa la Cámara de Representantes en su comparecencia, el mandato contemplado en la Ley Núm. 477 requiere que se obligue a redactar un proyecto a favor de la unicameralidad, que se emitan informes favorables de Comisión y el voto compulsorio favorable de una tercera parte de los miembros de cada cámara. Esto último presenta además un problema práctico: a cuáles legisladores habría que obligar a votar a favor del proyecto.

A todas luces, la Ley Núm. 477 interfiere con una de las funciones básicas de los legisladores y contradice el proceso constitucional dispuesto en el Artículo VII, Sección 1, *supra*. Sobre este particular, hacemos eco de nuestras expresiones en cuanto a que "el despojo o la limitación de alguna de las funciones básicas de un parlamento socavaría la base misma de la democracia del país concernido". Romero Barceló v. Hernández Agosto, 115 D.P.R. 368 (1984).

---

[11] Cabe mencionar que la Ley Núm. 477, *supra*, también estableció un mandato a la inversa. Dispuso que en caso de que el electorado votara a favor de la Bicameralidad sería un mandato a la Asamblea Legislativa para que mantenga a la Rama Legislativa de dos cámaras. En tal caso se hubiese coartado la facultad de la Asamblea Legislativa de comenzar un proceso de enmienda. Si interpretamos la Ley como sugieren los peticionarios y sostenemos su validez, la Asamblea Legislativa estaría imposibilitada de proponer enmiendas al electorado en cuanto a este asunto.

Los peticionarios arguyen que los legisladores juraron fidelidad a la Constitución, a las leyes y por eso están obligados a cumplir con el mandato dispuesto en la Ley Núm. 477, *supra*. Sin embargo, aclaramos que tal fidelidad no se requiere cuando la Ley en cuestión vulnera los principios y garantías constitucionales. Debemos recordar que la Constitución es nuestra Ley Suprema y todas las demás leyes tienen que estar conforme a la misma.

**En vista de lo anterior, resolvemos que la Ley Núm. 477 es incompatible con el proceso de enmienda dispuesto en el Artículo VII, Sección 1 de la Constitución del E.L.A.**

B.

Por otro lado, aún si se entendiera que la Ley Núm. 477 no adolece de vicios constitucionales, este Tribunal estaría impedido de conceder el remedio solicitado, en virtud de la doctrina de inmunidad parlamentaria. Dicha doctrina emana del Artículo III, Sección 14 de nuestra Constitución, el cual dispone:

> Ningún miembro de la Asamblea Legislativa será arrestado mientras esté en sesión la cámara de la cual forme parte, ni durante los quince días anteriores o siguientes a cualquier sesión, excepto por traición, delito grave, o alteración a la paz; **y todo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos** y expresiones en una u otra cámara o en cualquiera de sus comisiones.

En <u>Romero Barceló v. Hernández Agosto</u>, supra, tuvimos la oportunidad de recoger los postulados básicos de la doctrina de inmunidad parlamentaria. Estos son: (1) el propósito básico de la cláusula de inmunidad es garantizar

la independencia de la Rama Legislativa y fortalecer así el sistema de la separación de poderes; (2) el ámbito de la inmunidad es extenso: cubre toda actividad legislativa legítima, lo que incluye, a lo menos, las que se desarrollan en el hemiciclo de las cámaras y el seno de las comisiones; (3) son actividades legislativas legítimas, además de la de formular leyes, la de investigar y fiscalizar el Gobierno, la de rebatir asuntos de interés público y la de mantener informado al pueblo sobre la marcha de la cosa pública; (4) los motivos que inspiren una actividad legislativa legítima no son objeto apropiado de escrutinio judicial. *Id.*

De lo anterior se desprende que los legisladores gozan de amplia inmunidad parlamentaria en el ejercicio de sus funciones legislativas legítimas. Ello implica que contra un legislador no se pueden instar acciones legales por aquello que haga o exprese en el desempeño de las funciones para las cuales fue electo. Este privilegio no tendría razón de ser si un legislador tuviese que someterse al rigor de los procedimientos judiciales por el ejercicio vigoroso de sus prerrogativas legislativas. *Id.*

Cabe reiterar que para que un acto legislativo esté protegido por la inmunidad parlamentaria es necesario que se trate de una actividad legislativa legítima y que cumpla con los parámetros constitucionales. Según sostuvimos anteriormente, si el acto está dentro de la esfera constitucional de poder conferido a la Rama Legislativa, la doctrina de separación de poderes impide que la Rama

Judicial intervenga con la forma en que dicho poder fue ejercido. Peña Clos v. Cartagena Ortiz, 114 D.P.R. 598 (1983); Acevedo Vilá v. Meléndez Ortiz, *supra*.

Conforme hemos establecido, el proceso de enmendar la Constitución ha sido delegado a la Rama Legislativa del Gobierno. Por ende, no cabe duda que la decisión de si se debe iniciar o no dicho proceso constituye un acto legislativo legítimo dentro de nuestro sistema republicano de gobierno. De esta forma, la puesta en vigor del mandato contemplado en la Ley Núm. 477, *supra*, trasciende nuestro ámbito constitucional de poder.

Más aun, en virtud de la cláusula de inmunidad parlamentaria, los motivos que inspiraron la negativa de la Asamblea Legislativa de aprobar una Resolución Concurrente para proponer al pueblo las enmiendas constitucionales tampoco puede ser objeto de escrutinio judicial. Romero Barceló v. Hernández Agosto, *supra*. Por tanto, la evaluación sobre la decisión de los legisladores corresponde al electorado y no a los tribunales.

V.

Finalmente, examinemos la procedencia del recurso de *mandamus*. Recordemos que el auto de *mandamus* está disponible para ordenarle a una persona o a personas naturales, a una corporación o a un tribunal de inferior jerarquía, que cumplan o ejecuten un acto que forma parte de sus deberes y atribuciones. Artículo 649 del Código de Enjuiciamiento Civil (1933), 32 L.P.R.A. sec. 3421. Este recurso, por mandato expreso de ley, es uno altamente

privilegiado y su expedición es discrecional. Aunque estamos facultados para expedirlo en el ejercicio de nuestra jurisdicción original, de ordinario lo hacemos con prudencia y en circunstancias meritorias. Véase Const. E.L.A., Art. V, Sec. 5, 1 L.P.R.A.; Ley de la Judicatura de 2003, Art. 3.002(a), 4 L.P.R.A. sec. 24s(a); Art. 650 del Código de Enjuiciamiento Civil (1933), 32 L.P.R.A. sec. 3422.

La procedencia del *mandamus* depende inexorablemente **del carácter del acto** que se pretende compeler mediante dicho recurso. Acevedo Vilá v. Aponte Hernández, res. el 3 de julio de 2006, 2006 TSPR 115. Sólo debe expedirse cuando la persona a quien va dirigido esté "obligada al cumplimiento de un acto que la ley particularmente ordene como deber resultante de un empleo, cargo o función pública". 32 L.P.R.A. sec. 3422 y 3423. Es decir, el *mandamus* sólo procede para ordenar el cumplimiento de un deber ministerial, **que no admite discreción en su ejercicio, cuando no hay otro mecanismo en ley para conseguir dicho remedio**. Báez Galib v. C.E.E., 152 D.P.R. 382 (2000).

A tenor con lo anterior, hemos resuelto que cuando se nos solicita un *mandamus* contra un miembro de la Asamblea Legislativa debemos evaluar la naturaleza de la función que se pretende compeler. Acevedo Vilá v. Aponte Hernández, *supra*. De tratarse de alguna actividad legislativa legítima, no procedería el auto de *mandamus* en virtud de la protección que confiere la inmunidad parlamentaria. *Id*. En

vista de que, en el caso de autos, los peticionarios pretenden que ordenemos la ejecución de un acto relacionado con el proceso deliberativo y de votación inherente a las funciones parlamentarias, evidentemente se trata de un acto legislativo legítimo.

Los peticionarios nos solicitan que le ordenemos a la Asamblea Legislativa que apruebe unas enmiendas para cambiar la composición de la Rama Legislativa a tenor con el resultado del Referéndum celebrado el 10 de julio de 2005. En esencia, nos solicitan que intervengamos con un asunto que es claramente de la injerencia del Poder Legislativo según lo dispuesto en la Sección 1 del Artículo VII de la Constitución del Estado Libre Asociado de Puerto Rico. En otras palabras, se trata de una facultad discrecional de la Asamblea Legislativa y no de un deber ministerial exigible judicialmente. Por consiguiente, el *mandamus* solicitado por los peticionarios es constitucionalmente improcedente.

## VI.

A modo de epílogo, somos conscientes de que una mayoría del electorado puertorriqueño se expresó a favor de que la Legislatura propusiera enmiendas para que se adoptara un modelo unicameral. Sin embargo, nuestro ordenamiento constitucional nos impide ordenarle a los miembros de cualquiera de los cuerpos que legislen de tal forma que se inicie el proceso de enmienda a la Constitución dispuesto en el Artículo VII. El mandato establecido en la ley bajo análisis es contrario a nuestra

Ley Suprema. Como garantes del ordenamiento constitucional, tenemos la ineludible obligación de asegurar que cualquier proceso de enmienda constitucional cumpla con lo dispuesto en nuestra Constitución. Esa es, en última instancia, nuestra responsabilidad.

Conforme a lo anterior, es en el foro político y por medio de las urnas que los peticionarios deben requerir que se les rindan las cuentas correspondientes. Cualquier otra decisión de nuestra parte sería contraria al sistema republicano de gobierno y a la Constitución que hemos jurado defender.

## VII.

Por los fundamentos antes expuestos, se expide el auto y se confirma la Sentencia del Tribunal de Apelaciones y, por consiguiente, la del Tribunal de Primera Instancia en cuanto desestimaron el recurso instado por los peticionarios.

Se dictará la Sentencia correspondiente.

FEDERICO HERNÁNDEZ DENTON
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

```
José Córdova Iturregui y Otros    *
                                  *
    Peticionarios                 *
                                  *
        vs.                       *    CC-2007-350
                                  *
                                  *
Cámara de Representantes del      *
Estado Libre Asociado de          *
Puerto Rico y Otros               *
                                  *    Certiorari
    Recurridos                    *
**********************************
Raquel del Valle (Desistió)       *
y Otros                           *
                                  *    Consolidados
    Peticionarios                 *
                                  *
        vs.                       *    CC-2007-361
                                  *
Francisco González Rodríguez      *
y Otros                           *
                                  *
    Recurridos                    *
******************************
```

SENTENCIA

San Juan, Puerto Rico, a 29 de junio de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se expide el auto y se confirma la Sentencia del Tribunal de Apelaciones y, por consiguiente, la del Tribunal de Primera Instancia en cuanto desestimaron el recurso instado por los peticionarios.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri y la Juez Asociada señora Rodríguez Rodríguez emitieron Opiniones de Conformidad. El Juez Asociado señor Rebollo López emitió Opinión Disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

José Córdova Iturregui y Otros   *
                                     *
    Peticionarios                 *
                                       *
          Vs.                 *
                                       *
Cámara de Representantes del    *
Estado Libre Asociado de       *   CC-2007-350
Puerto Rico y Otros           *
                                     *
     Recurridos             *
*******************************   Certiorari
Raquel del Valle (Desistió)    *
Y Otros                    *
                                     *
    Peticionarios              *   Consolidados
                                     *
          Vs.                 *
                                     *
Francisco González Rodríguez   *   CC-2007-361
y Otros                    *
                                     *
     Recurridos             *
*******************************

Opinión de Conformidad emitida por el Juez Asociado señor Fuster Berlingeri.

San Juan, Puerto Rico, a 29 de junio de 2007.

I

Coincido con el dictamen mayoritario en que el caso de autos presenta esencialmente asuntos que la doctrina de **cuestión política** nos impide resolver. Deseo, sin embargo, añadir algunas consideraciones sobre el particular, adicionales a las formuladas en la Opinión de la mayoría del Tribunal, para que quede meridianamente claro porqué es que no podemos intervenir aquí.

Como se sabe, una de las doctrinas más importantes y autóctonas del Derecho Constitucional norteamericano es la de

la **cuestión política**. Amparado en dicha doctrina, el Tribunal Supremo de Estados Unidos ha resuelto algunos de los casos más importantes en su historia, casos famosos bien conocidos para los juristas especialistas en Derecho Constitucional. En esencia, conforme a dicha doctrina, los tribunales están impedidos de inmiscuirse en aquellos asuntos que la Constitución ha encomendado específicamente a las otras ramas del gobierno, las llamadas **ramas políticas**. Es decir, no son susceptibles de determinación judicial aquellas cuestiones que le competen propiamente a la Legislatura o al Ejecutivo.

Como bien se señala en la propia Opinión de la mayoría del Tribunal, la doctrina de la cuestión política es una limitación a la función judicial que emana de otra normativa más general, que es la relativa a la **separación de poderes**. Se procura, pues, **guardar la esfera de autoridad de cada una de las tres ramas de gobierno**.

La doctrina de la cuestión política ha sido discutida ampliamente por este Tribunal en ocasiones anteriores. Lo hicimos así en <u>Santa Aponte v. Srio. del Senado</u>, 105 D.P.R. 750 (1977); luego otra vez en <u>Silva v. Hernández Agosto</u>, 118 D.P.R. 45 (1986); y más recientemente en <u>Noriega v. Hernández Colón</u>, 135 D.P.R. 406 (1994). **Se trata de una doctrina muy reiterada por este Foro**, siendo las tres decisiones mencionadas antes nuestros pronunciamientos más importantes sobre el particular, pero ciertamente no los únicos. Aunque no hemos utilizado dicha doctrina antes en la

forma que el Tribunal Supremo de Estados Unidos lo ha hecho en casos notables, no cabe duda de que la hemos adoptado, en nuestro haber jurisprudencial.

**En el caso de autos, aplica medularmente la doctrina de la cuestión política**. El asunto de viabilizar el establecimiento de un sistema legislativo unicameral en Puerto Rico sólo le compete indudablemente a las ramas políticas del Gobierno. Es cierto que la inmensa mayoría de los electores que participaron en el referéndum sobre el sistema unicameral celebrado el 10 de julio de 2005 votó a favor de dicho sistema. **Ese voto claramente representa un mandato imperioso a las cámaras legislativas que las obligan moral y políticamente a actuar de conformidad con el resultado electoral**. No obstante, la doctrina reseñada antes, corolario de la separación de poderes, **impide que este Tribunal tome cartas en el asunto**. No podemos inmiscuirnos para hacer valer el mandato electoral sobre la unicameralidad sencillamente porque **carecemos de autoridad para resolver la generalidad de los asuntos implícitos en hacer valer dicho mandato**. La doctrina de la cuestión política nos prohíbe asumir jurisdicción aquí. Veamos concretamente porqué ello es así.

La solicitud de *mandamus* que aquí nos concierne procura que ordenemos a la Asamblea Legislativa que apruebe los proyectos que sean necesarios para celebrar un referéndum dirigido a enmendar la Constitución del Estado Libre Asociado de Puerto Rico para establecer un sistema

legislativo unicameral. Los peticionarios han solicitado que le ordenemos a los legisladores, en primer lugar, a poner en marcha un proceso de enmienda a la Constitución, independientemente de lo que dichos legisladores ahora piensen sobre el particular. Por ejemplo, es conocido que algunos de estos legisladores creen que el resultado del referéndum sobre la unicameralidad **no constituye un mandato vinculante**. Ello, por la escasa participación del electorado en el referéndum referido el 10 de julio de 2005. Se trata del referéndum menos concurrido de los últimos veinte años. Según los legisladores aludidos, la escasa participación del electorado permite cuestionar si existe un mandato claro y obligatorio del pueblo de Puerto Rico a favor de la unicameralidad.

**En sus méritos, la postura de los legisladores aludidos es claramente debatible**. Pero, precisamente, la cuestión es si le corresponde a este Tribunal dilucidar esa controversia jurídicamente. Conforme a la doctrina de cuestión política, **no es asunto nuestro dilucidar si la participación electoral en el referéndum aludido constituye o no una expresión adecuada del parecer del pueblo de Puerto Rico respecto a la unicameralidad**. Ello es claramente un asunto que no nos compete decidir.

Más aun, la labor de establecer un sistema unicameral requiere necesariamente atender numerosos asuntos afines, que claramente son sólo de la ingerencia de las ramas políticas del Gobierno. Por ejemplo, (1) ¿Cuántos escaños

debe tener la cámara legislativa única? ¿Deben ser 27 como en el Senado actual o 51 como en la Cámara de Representantes actual? (2) ¿Cuál será la proporción entre los miembros electos por distritos representativos en relación a los electos por acumulación? ¿Cuántos habrán de unos y de otros? (3) ¿Cuándo comenzará a operar el nuevo sistema unicameral? (4) ¿Cómo estará constituida la representación garantizada de partidos de minoría? (5) ¿Qué requisitos de edad mínima tendrán los miembros de la cámara única: 25 años como los representantes actuales o 30 años como los senadores actuales? Estos asuntos y otros deben ser atendidos propiamente por las ramas políticas del Gobierno y el electorado. **No corresponden de modo alguno a la discreción judicial**.

En resumen, pues, importantes asuntos de distinta índole deben ser decididos sólo por las otras dos ramas del gobierno y el electorado como parte de la ingente gestión de implantar un sistema unicameral. Ello hace patente la aplicación aquí de la doctrina de la **<u>cuestión política</u>**. Por eso, por más legítima que sea la controversia que plantean los peticionarios, no tiene jurisdicción este Tribunal para atenderla. No debe cederse a la tentación de intervenir aquí para fijarle supuestas obligaciones legales a la Asamblea Legislativa.

Jaime B. Fuster Berlingeri
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| José Córdova Iturregui y otros<br>    Peticionarios<br><br>       v.<br><br>Cámara de Representantes del E.L.A. de P.R y otros<br><br>Raquel del Valle (Desistió) y otros<br>    Peticionarios<br><br>       v.<br><br>Francisco González Rodríguez y Otros<br>    Recurridos | CC-2007-350<br><br><br><br>Consolidados<br><br>CC-2007-361 |

Opinión de conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 29 de junio de 2007

En el día de hoy, una mayoría de este Tribunal resuelve que es inexigible judicialmente e inconstitucional el mandato contenido en la Ley núm. 477 del 23 de septiembre de 2004, conocida como la Ley del referéndum sobre el sistema cameral[*sic*] de la Asamblea Legislativa, 16 L.P.R.A. secs. 971-971(t), el cual pretende obligar a la Decimoquinta Asamblea Legislativa del Estado Libre Asociado a iniciar un proceso para enmendar la Constitución de Puerto Rico. Estoy conforme con la opinión mayoritaria puesto que la decisión discrecional de enmendar la Constitución le corresponde exclusivamente a la Asamblea Legislativa. Empero, debo puntualizar varios aspectos de esta controversia que merecen especial atención de esta Curia.

En esencia, la mayoría apuntala su decisión en el hecho que la Constitución del Estado Libre Asociado de Puerto Rico delega expresamente en la Asamblea Legislativa la facultad de iniciar el procedimiento de enmiendas a la Constitución y no contempla la posibilidad de que los ciudadanos obliguen a la Asamblea Legislativa a presentar propuestas de enmiendas a la Constitución. Aun cuando sustantivamente lo indicado por la mayoría en su opinión es correcto, a mi juicio, es menester aclarar que, como cuestión de umbral, necesariamente hay que examinar los efectos jurídicos del referéndum que la Ley núm. 477 autorizó y la facultad de una Asamblea Legislativa de obligar a sus sucesoras a proponer enmiendas a la Constitución.

Dos argumentos principales demuestran que el mandato establecido en la Ley núm. 477 para que la Asamblea Legislativa inicie un procedimiento de enmiendas a la Constitución carece de efectos jurídicos y por ende, es judicialmente inexigible. En primer término, la Ley núm. 477 no convocó un referéndum para ratificar una enmienda a la Constitución, más bien ordenó la celebración de un referéndum consultivo que, por su propia naturaleza, no puede obligar a la Asamblea Legislativa a enmendar la Constitución. En segundo término, es inválido un mandato legislativo que comprometa los votos de una Asamblea Legislativa posterior y pretenda obligar a sus miembros a aprobar cierta legislación. *Pueblo v. Tribunal de Distrito,* 70 D.P.R. 678, 681 (1949). Veamos.

I

Como es sabido, "[e]l referéndum es el método por el cual el voto de los ciudadanos determina si una propuesta legislativa o constitucional debe aprobarse".[12] *La Nueva Constitución de Puerto Rico*, Ed. Universidad de Puerto Rico, Río Piedras, 2005, pág. 439. "[E]s la votación encaminada a expresar el asentimiento o disentimiento del cuerpo electoral… a una propuesta de resolución de un órgano del poder". L. Sánchez Agesta, *Principios de Teoría Política*, 5ta ed., Madrid, Ed. Nacional, 1974, pág. 289.

Los contornos de esta figura de carácter multiforme se determinan por diversos criterios tales como la materia sobre la que dicha consulta versa, su eficacia normativa, la necesidad de la intervención popular y el alcance o grado de obligatoriedad de dicho mecanismo de consulta. *Véanse Diccionario de Política*, José Arico & Jorge Tula, redactores, México, Siglo XXI, 1982, volumen II, pág. 1394; L. Sánchez Agesta, *op cit.*; L. López Guerra, *Introducción al Derecho Constitucional*, Valencia, Tirant Lo Blanch, 1994, págs. 135-36.

El referéndum puede ser de carácter *legal o constitucional*, dependiendo de la naturaleza de la resolución que se aprueba; *obligatorio o facultativo*, dependiendo de si la celebración de dicha consulta es un acto necesario para la

---

[12] La Ley electoral, define indistintamente los términos referéndum y plebiscito e indica que ambos constituyen el "procedimiento mediante el cual se somete al electorado del Estado Libre Asociado de Puerto Rico la aprobación o rechazo de uno o varios asuntos de interés general. 16 L.P.R.A. sec. 3003.

validez de la resolución o si su aplicación depende de la
aprobación del órgano que propone la resolución o de una
petición de los electores;[13] **consultivo, si recae sobre una
propuesta no articulada**, y de **ratificación**, si su objeto es
una resolución definitiva que sólo aguarda la sanción de los
electores.    L. Sánchez Agesta, *op cit.,* pág. 290.    *Véase
además, Gierbolini Rodríguez v. Gobernador*, 129 D.P.R. 402,
415 (1991). (Op. disidente, Juez Negrón García).

En virtud de lo anterior, los efectos jurídicos de un
referéndum se deben estudiar a la luz de la legislación que
lo convoca, del tipo de propuesta que se presenta al
electorado y del propósito que dicha consulta persigue.  La
diferenciación entre referéndum consultivo y de ratificación
es particularmente relevante pues demuestra que la
participación del elector en este tipo de consulta no obsta
a que dicho referéndum carezca de efecto jurídico vinculante
en el órgano estatal que lo convoca.   Su obligatoriedad
depende entonces de la naturaleza de la consulta y del
estatuto que la crea.

Como vimos, existe un tipo de referéndum que "produce
efectos jurídicos inmediatos sin necesidad de mediación
alguna por parte de otro órgano", mientras que, por otro
lado, existe un referéndum consultivo "cuyos resultados
pueden permitir un cierto margen de apreciación… en la
determinación de los efectos que políticamente se derivan del

---

[13] En el caso del referéndum facultativo, la decisión que se
somete al electorado también se podría adoptar sin recurrir
a dicho proceso de consulta.   L. López Guerra, *op cit.,*
pág. 135.

resultado". *Diccionario Jurídico Espasa*, Madrid, Ed. Espasa,

2005, pág. 1240. Podemos identificar entonces un tipo de

referéndum vinculante en el cual "la voluntad popular…

obliga como decisión jerárquicamente superior a cualquier

otra", y un tipo de referéndum consultivo en el cual "el

resultado de la 'consulta' popular sería un dato más, pero

no el único, a tener en cuenta a la hora de adoptar la

decisión final".[14] L. López Guerra, *op cit.*, pág. 136.

En nuestro ordenamiento constitucional, el referéndum

es el vehículo adecuado para enmendar la Constitución. El

artículo VII, sección 1 de la Constitución del Estado Libre

Asociado de Puerto Rico dispone el procedimiento que la

Asamblea Legislativa debe seguir para proponer enmiendas a

la Constitución mediante referéndum. Dicho artículo reza:

> La Asamblea Legislativa podrá proponer
> enmiendas a esta Constitución **mediante resolución**
> **concurrente que se apruebe por no menos de dos**
> **terceras partes del número total de los miembros de**

---

[14] Esto no implica que "la voluntad democrática pueda ser simplemente ignorada". *Id.*, pág. 136. Sin embargo, no puede obligarse al organismo estatal que convocó la consulta a actuar en contra de sus propios criterios o de la voluntad de sus miembros quienes en última instancia tienen la responsabilidad constitucional de decidir si traducen en ley la opinión del electorado expresada en el referéndum. *Véase Id.* En forma análoga, y a modo de ejemplo, el artículo 92.1 de la Constitución española dispone que "[l]as decisiones políticas de especial trascendencia podrán ser sometidas a referéndum consultivo de todos los ciudadanos". Art. 92.1, Const. Esp. En su estudio sobre dicha disposición constitucional, el comentarista Pérez Royo indica que "la decisión [que resulte de dicha consulta] carecerá de efectos jurídicos directos". J. Pérez Royo, *Curso de Derecho Constitucional*, 9na ed. Madrid, Marcial Pons, 2003, pág.637. En la práctica, sin embargo, este referéndum sí tiene efectos decisivos en los órganos representativos del cuerpo electoral, pero "para alcanzar virtualidad jurídica los resultados de la consulta tendrán que ser ratificados formalmente por el correspondiente órgano del Estado…". *Id.*

**que se compone cada cámara.** Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum. **Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum.**[15]

Artículo VII, sección 1, Const. E.L.A., L.P.R.A., Tomo I.

Como se observa, el artículo antes trascrito adopta un referéndum de carácter obligatorio y de ratificación (o vinculante). Este procedimiento especial garantiza que la enmienda propuesta "está en efecto respaldada por el consenso que… representa la aquiescencia general al cambio propuesto". *La Nueva Constitución de Puerto Rico*, *op. cit.* pág. 521. En este proceso es indispensable que el pueblo ratifique la enmienda. Luego de ratificada, ésta formará parte de la Constitución sin necesidad de ulterior actuación legislativa.

Con este marco doctrinal como norte, un análisis de las características del referéndum celebrado el 10 de julio de 2005 en virtud de la Ley núm. 477 demuestra que éste fue uno

---

[15] La sección 2 del Artículo VII dispone además que "[l]a Asamblea Legislativa podrá, mediante resolución concurrente aprobada por dos terceras partes de los miembros de que se compone cada Cámara, consultar a electores capacitados si desean que se convoque a una convención constituyente para hacer una revisión de esta Constitución". Art. VII, sec. 2, Const. E.L.A., Tomo I. La Ley núm. 477, sin embargo, no aprobó este método de consulta al pueblo como mecanismo para enmendar la Constitución.

de carácter consultivo y que no reunió los requisitos que el Artículo VII, sección 1 de nuestra Constitución exige para enmendar la Constitución.

En primer término, la Ley núm. 477 aprobó un referéndum para que el Pueblo de Puerto Rico expresara si favorecía cambiar la Asamblea Legislativa a una sola cámara o si favorecía mantener la Asamblea Legislativa compuesta por dos cámaras.[16] *Véase* Artículo 3, Ley núm. 477, 16 L.P.R.A. sec. 971(a). Según la exposición de motivos de la Ley núm. 477, el propósito del referéndum que se celebró el 10 de julio de 2005 fue consultar "al Pueblo sobre su preferencia en cuanto a cómo se ejerce el Poder Legislativo" en nuestro país. Exposición de Motivos, Ley núm. 477 de 23 de septiembre de 2004, 2004 Leyes de Puerto Rico, 3123. De resultar victoriosa la opción de la unicameralidad para Puerto Rico, "ello constituiría una mandato a la Asamblea Legislativa para que celebre un referéndum especial proponiendo al Pueblo,… las enmiendas constitucionales necesarias para establecer un Sistema Unicameral [en Puerto Rico]...". *Id.* Por tanto, surge con perfecta claridad de la exposición de motivos de la Ley núm. 477 que dicho estatuto sólo autorizó un referéndum consultivo para auscultar el sentir del electorado puertorriqueño en torno a la posibilidad de iniciar un procedimiento de enmienda a nuestra Constitución.

---

[16] En el referéndum celebrado participó el 22.6% del electorado inscrito. De ese porcentaje de los electores, el 83.8% favoreció la unicameralidad.

En segundo término, a poco que examinemos el texto de la Ley núm. 477, podemos colegir que dicho estatuto no contiene pauta alguna sobre los términos y vigencia de una enmienda a la Constitución. Por el contrario, se limita a disponer los contornos procesales de la consulta sobre la unicameralidad y provee el financiamiento necesario para celebrarla. 16 L.P.R.A. secs. 971-971(t). Finalmente, el proyecto que le dio vida a la Ley núm. 477, Proyecto del Senado núm. 2672, no cumplió con las exigencias del artículo VII, sección 1 de la Constitución para aprobar un referéndum constitucional ya que no se aprobó mediante el voto de dos terceras partes del número total de los miembros de que se compone cada cámara.[17]

En fin, el propio texto de la Ley núm. 477 y el proceso que culminó en su aprobación revelan que dicho estatuto no aprobó un referéndum para enmendar la Constitución.[18] Por tanto, el propósito de la consulta celebrada el 10 de julio de 2005 no fue permitir, como dispone nuestra Constitución, que el electorado puertorriqueño ratificara una enmienda a

---

[17] Según surge del trámite legislativo del Proyecto del Senado núm. 2672, éste no obtuvo el voto afirmativo de dos terceras partes de los miembros que componen cada Cámara. En la Cámara de Representantes el Proyecto obtuvo el aval de veintinueve (29) miembros, mientras que en la votación final ante el Senado, el proyecto enmendado obtuvo el voto afirmativo de 17 miembros de dicho cuerpo. *Véase* el trámite de aprobación del P. del S. núm. 2672 (2004) *disponible en Oficina de Servicios Legislativos,* www.oslpr.org. (última visita 22 de junio de 2007).

[18] De igual modo, no arguyen los demandantes-recurrentes que la Asamblea Legislativa inició dicho procedimiento constitucional de enmienda. Por el contrario, aducen que la Decimoquinta Asamblea Legislativa del Estado Libre Asociado está obligada a seguir el mandato electoral del pueblo que se expresó a favor de la unicameralidad en un referéndum válido, convocado mediante estatuto por la Decimocuarta Asamblea Legislativa.

nuestra Constitución. Es decir, dicho referéndum fue uno de carácter consultivo y sus efectos jurídicos dependerán de que la Asamblea Legislativa inicie, **dentro de su discreción**, un proceso de enmienda a la Constitución. Como corolario de esto, es menester concluir que, por su propia naturaleza, dicho referéndum no vincula jurídicamente a futuras Asambleas Legislativas.

No estando en controversia que la Ley núm. 477 convocó un referéndum consultivo con el propósito de **obtener la opinión del** Pueblo de Puerto Rico sobre la unicameralidad, sólo resta examinar si la Decimocuarta Asamblea Legislativa del Estado Libre Asociado de Puerto Rico podía, mediante la aprobación de la Ley núm. 477, obligar a la Decimoquinta Asamblea Legislativa (o a los legisladores) a aprobar un referéndum para proponer enmiendas a la Constitución y establecer una Asamblea Legislativa unicameral.

## II

En el pasado hemos indicado que "una legislatura no puede restringir o limitar su poder ni el de futuras legislaturas para aprobar, enmendar o derogar leyes". *Pueblo v. Tribunal de Distrito, supra. Véanse* además, *Gierbolini Rodríguez v. Gobernador*, supra, pág. 426(Op. disidente, Juez Negrón García); *United States v. Winstar Corp.,* 518 U.S. 839, 872-74 (1996); *Reichelderfer v. Quinn,* 287 U.S. 315, 318 (1931); *Stone v. Mississippi,* 101 U.S. 814, 819-20 (1880); *Fletcher v. Peck*, 10 U.S. 87, 6 Cranch 87 (1810) ("one legislature is competent to repeal any act which a former

legislature was competent to pass; and that **one legislature cannot abridge the powers of a succeeding legislature.**")(énfasis nuestro).[19]

A tenor con este principio, cada legislatura tiene el mismo poder que la anterior de tomar decisiones de política pública sobre la sabiduría y **conveniencia de legislar en determinada materia o de votar a favor de un proyecto de ley.**[20] Ello, en virtud de su facultad constitucional de proponer, estudiar y aprobar leyes. Artículo II, sección 17, Const. E.L.A., L.P.R.A., Tomo I.

Del mismo modo, como bien señala la opinión mayoritaria, cada Asamblea Legislativa goza de discreción para iniciar un

---

[19] *Véase Newton v. Commissioners,* 100 U.S. 548, 10 Otto 548 (1879). El professor Laurence Tribe indica en este respecto:

> Similarly, the power of Congress *legislatively* to bind subsequent Congresses is limited, for any statute that purported to direct certain things or follow certain procedures could be repealed, as could any other law, by another law, by another duly enacted statute. … This prospect, along with other concerns, calls into question the constitutional propriety, not merely the practical efficacy, of any attempt to supplement, or subtract from, what the Constitution requires for a law to be validly enacted.

L.H. Tribe, *American Constitutional Law*, 3era ed., New York, Foundation Press, 2000 Vol. I, pág. 125 n.1.

[20] Ello, salvo circunstancias excepcionales que no están presentes en este caso. Por ejemplo, no podemos olvidar que "en ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior". 31 L.P.R.A. sec. 3. *Véase además Consejo de Titulares del Condominio New San Juan v. Williams Hospitality Group,* 2006 T.S.P.R. 94, res. el 1ero de junio de 2006, 168 D.P.R. __. Además, en virtud de la sección 7 del Artículo II de la Constitución de Puerto Rico, la Asamblea Legislativa no podrá aprobar leyes que menoscaben obligaciones contractuales. Art. II, sec. 7, Const. E.L.A. sec. 7, L.P.R.A., Tomo I. *Véanse además, Bayrón Toro v. Sierra*, 119 D.P.R. 605, 619-20 (1987); *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 394-97 (1973).

procedimiento de enmienda a la Constitución y someter una propuesta de enmienda a la consideración de los electores capaces mediante referéndum. Esta discreción no puede limitarse mediante un mandato legislativo previo. En otras palabras, una legislatura no tiene la facultad de compeler a otra a iniciar un proceso de enmienda a la Constitución.

En virtud de lo anterior, resulta ineludible concluir que el mandato de la Ley núm. 477 carece de fuerza vinculante sobre la Decimoquinta Asamblea Legislativa y es judicialmente inexigible. Al indicar que un resultado favorable a la unicameralidad implicaría un mandato a la próxima Asamblea Legislativa para iniciar un proceso de enmienda a la Constitución, la Ley núm. 477 le impuso una traba inconstitucional a la Decimoquinta Asamblea Legislativa. Como intérpretes de la Constitución, no podemos conferirle efecto jurídico alguno a dicho mandato. La Decimocuarta Asamblea Legislativa tomó una decisión de política pública al ordenar la celebración de un referéndum consultivo sobre la unicameralidad. Más sin embargo, esta decisión no puede comprometer el criterio o el voto de Asambleas Legislativas futuras. Tampoco puede obligarlas a proponer enmiendas a la Constitución para establecer una Rama Legislativa unicameral.

**III**

A modo de conclusión, debo puntualizar lo siguiente. Nada en nuestro ordenamiento o en nuestra Constitución le impedía a la Decimocuarta Asamblea Legislativa convocar un referéndum en el cual los electores puertorriqueños podrían

expresar su sentir sobre el sistema legislativo que favorecen. Ahora bien, al evaluar desapasionadamente la naturaleza jurídica del proceso autorizado por la Ley núm. 477, es evidente que el carácter consultivo del mismo no tiene el alcance de obligar a la Asamblea Legislativa a proponer enmiendas a nuestra Constitución para instaurar la unicameralidad, como se pretende. Es decir, **jurídicamente**, el referéndum legislado fue sólo una consulta para palpar el sentir del electorado sobre un tema de trascendencia, sin mayor consecuencia.

No obstante, este carácter consultivo no implica que el resultado del referéndum celebrado el 10 de julio esté huérfano de efecto alguno en nuestras ramas representativas de gobierno. Este efecto se reserva al ámbito político, por lo que a fin de cuentas y como siempre ocurre en una democracia, es a través del ejercicio del voto que los electores expresan su sentir sobre los distintos asuntos que se discuten a diario en la vida política puertorriqueña.

Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| José Córdova Iturregui y otros | |
| Peticionarios | |
| vs. | |
| | CC-2007-350 |
| Cámara de Representantes del Estado Libre Asociado de Puerto Rico y otros | CERTIORARI |
| Recurridos | |
| Raquel del Valle (Desistió) y otros | CONSOLIDADOS |
| Peticionarios | CC-2007-361 |
| vs. | |
| Francisco González Rodríguez y otros | |
| Recurridos | |

OPINIÓN DISIDENTE EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico a 29 de junio de 2007

Una de las características del ejercicio de la profesión legal que más le llama la atención al ciudadano común y corriente --y que más difícil le resulta entender-- es que las dos posiciones contrarias de, prácticamente, todas las controversias legales que a diario se plantean ante los tribunales de justicia pueden ser objeto, ambas, de fundamentada argumentación y resolución; situación que, entendiblemente, resulta sumamente difícil de aceptar para el ciudadano lego en estas cuestiones y que, posiblemente, sea una de las principales razones por las cuales la profesión legal no goza de la confianza y estima que debería de tener entre la ciudadanía.

Hay ocasiones, sin embargo, en que no obstante los aparentes fundamentados argumentos que un tribunal utiliza en apoyo del resultado que promulga, un somero análisis de la decisión judicial emitida, y de los argumentos en ésta esbozados, es todo lo que se necesita para que una persona pueda percatarse de lo errado del proceder judicial en ese caso en particular. Esa, precisamente, es la situación en el recurso hoy ante nuestra consideración. El error cometido por la mayoría de los integrantes del Tribunal en la decisión que emite en el presente caso es tan abismal que el mismo "resalta a la vista y hiere la retina".[21]

La decisión mayoritaria emitida en el recurso de epígrafe es errónea, lamentable y --porqué no decirlo-- una acomodaticia. Así no se le hace justicia a este pueblo.

Los ciudadanos de este bendito País tienen el derecho a que, si les asiste la razón, este Tribunal así lo determine y decrete, independientemente de cuántas veces haya que fallar o decidirle en contra a determinado sector de nuestra sociedad.

No podemos avalar esa clase de conducta judicial y, mucho menos, permanecer callados. Nuestro norte siempre tiene que ser, como árbitros de las controversias que afectan a nuestra ciudadanía, darle la razón al que la tenga sin tomar en consideración que a algunas personas, o funcionarios, les pueda disgustar nuestras decisiones, esto es, independientemente de las consecuencias que éstas nos

---

[21] In re: Roldán González, 113 D.P.R. 238, 242 (1982).

puedan acarrear. <u>No ejercemos nuestro ministerio dentro de un concurso de popularidad.</u>

Resolver, como lo hace la Mayoría, que la Ley 477 del 23 de septiembre de 2004, aprobada por la Decimocuarta Asamblea Legislativa de Puerto Rico, no tiene consecuencia legal alguna, por lo que no obliga a la actual Asamblea Legislativa --en específico, a la Cámara de Representantes-- a actuar conforme claramente establece la mencionada Ley 477 <u>significa, llana y sencillamente, que dicha acción legislativa fue una "tomadura de pelo a nuestra ciudadanía", es decir, que fue un ejercicio de futilidad llevar a cabo el referéndum celebrado el 10 de junio de 2005, y, peor aún, un gasto de dinero superfluo y hasta, posiblemente, ilegal.</u>

I

La Sección 1 del Artículo VII de la Constitución del Estado Libre Asociado de Puerto Rico establece que:

> Sección 1 - La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros que se compone cada cámara. Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de

esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum.

No hay que ser ni muy inteligente ni muy perspicaz para correctamente poder concluir que, por mandato constitucional, todo <u>intento</u> de enmendar nuestra Constitución --aun cuando inicialmente sea recomendado, digamos, a manera de ejemplo, por el Gobernador de Puerto Rico-- se tiene que <u>originar</u> en la Asamblea Legislativa.

Eso, <u>precisamente</u>, fue lo que sucedió en el presente caso en el 2004. La <u>acción</u> de enmendar la Constitución --respecto a la existencia de una sola cámara legislativa-- <u>se originó en la Asamblea Legislativa</u>.

Lo que sucede es que la Legislatura, teniendo en dicho momento el pleno poder o facultad para aprobar, mediante resolución conjunta o una ley, la celebración inmediata y directa de un referéndum --especificando, desde un principio, las enmiendas específicas a la Constitución, esto es, y a manera de ejemplo, de cuántos miembros se compondría dicha unicámara, los distritos electorales que éstos miembros representarán, entre otros-- <u>determinó dividir este proceso de enmienda en dos etapas o partes</u>; procedimiento que es completamente legal porque "el que puede lo más, puede lo menos". <u>Pueblo</u> v. <u>Valentín Burgos</u>, 135 D.P.R. 245 (1994).

La Asamblea Legislativa --actuando en forma cautelosa-- determinó mediante una <u>ley</u> que en la <u>primera</u> de

esas etapas la ciudadanía votaría sobre si favorecía, o no, la unicameralidad. Estableció --de forma clara y específica-- mediante la citada Ley 477, en lo pertinente, que un voto a favor de la unicameralidad "…significaría un mandato a la Asamblea Legislativa para que se celebre un referéndum el 9 de julio de 2007, con el fin de proponer al electorado que se enmiende la Constitución del Estado Libre Asociado de Puerto Rico, de forma tal que a partir del 2 de enero de 2009, la Asamblea Legislativa de Puerto Rico esté constituida bajo una sola cámara". (Énfasis suplido.)

La única interpretación, lógica y razonable, del lenguaje de la Ley antes citada es a los efectos de que, celebrada la consulta el 10 de junio de 2005 y habiendo resultado favorecida por el pueblo la unicameralidad, la actual Asamblea Legislativa viene en la obligación de pasar a la segunda etapa establecida por la Ley 477.

Dicho de otra manera, ya no le corresponde a la presente Asamblea Legislativa ejercer su discreción sobre si puede celebrar, o no, el referéndum sobre la unicameralidad ya que, repetimos, está obligada a ello. Sobre lo que sí tiene discreción --en esta segunda etapa-- es sobre la decisión de qué enmienda específica a la Constitución le van a proponer al pueblo; votación que tiene que ser aprobada por dos terceras partes de sus miembros.

¿Por qué están así obligados? Llana y sencillamente porque ellos representan al pueblo, el pueblo ya se

expresó, <u>favoreció</u> la unicameralidad, decidió que <u>sí</u> quieren que se celebre el referéndum, <u>y el pueblo es soberano</u>. Ni más ni menos.

En resumen, la actual Asamblea Legislativa <u>no</u> puede en esta etapa pasar juicio sobre la deseabilidad de celebrar un referéndum sobre la unicameralidad. <u>Esa decisión ya la tomó el pueblo</u>. En consecuencia, la Legislatura <u>no</u> goza de discreción para negarse a ello. Lo <u>único</u> que tiene que decidir la actual Asamblea Legislativa es determinar el lenguaje de la enmienda a la Constitución que se le va a someter al pueblo.

Aquí <u>no</u> se trata, como se nos quiere hacer creer, de que una Asamblea Legislativa no puede obligar a otra. Ese argumento <u>podría</u> utilizarse bajo <u>otra</u> situación de hechos y circunstancias en las cuales no exista un <u>mandato expreso</u> del pueblo de Puerto Rico. <u>De lo que aquí realmente se trata es que la actual Asamblea Legislativa no puede ignorar el mandato que este pueblo emitió el 10 de junio de 2005</u>. Debe recordarse que el poder que posee la Asamblea Legislativa se lo concede, <u>o emana de</u>, el pueblo de Puerto Rico, <u>quien es el soberano</u>. La Asamblea Legislativa <u>no</u> es autónoma <u>ni</u> omnipotente; <u>ésta depende de los mandatos y poderes que le concede el pueblo</u>.

Por otro lado, debe mantenerse presente que los componentes de la actual Asamblea Legislativa, al tomar posesión de sus cargos, juraron <u>defender y obedecer</u> la Constitución y las leyes del Estado Libre Asociado de

Puerto Rico; es por ello que vienen obligados a obedecer las disposiciones de la citada Ley 477 de 2004, la aplicación de cuya ley culminó en un mandato del pueblo a esa Legislatura.

Resolver lo contrario --como lo hace la mayoría de los integrantes del Tribunal, amparándose en argumentos erróneos y en doctrinas que no son aplicables a los hechos del presente caso-- es resolver que los miembros de una Asamblea Legislativa en particular son "más soberanos" que el pueblo de Puerto Rico, lo cual resulta ser insostenible y absurdo.

## II

Es norma reiterada que la jurisdicción de nuestros tribunales se limita a aquellas instancias en que pueda precisarse la existencia de un caso o controversia, pues "los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas". E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958). Es por ello que en función de la doctrina de separación de poderes y dentro de nuestro esquema de auto-limitación judicial, hemos establecido que la Rama Judicial no intervendrá en asuntos en que esté involucrada una "cuestión política".

"La doctrina de cuestión política plantea, en esencia, que hay asuntos que no son susceptibles de determinación

judicial porque su resolución corresponde a las otras ramas de gobierno --ejecutivo y legislativo-- y no al poder judicial". Noriega Rodríguez v. Hernández Colón, 135 D.P.R. 406, 422 (1994). No obstante, ante distintos reclamos de cuestión política atendidos en el pasado, este Tribunal ha expresado que dicha doctrina no priva a los tribunales de su deber de interpretar la Constitución y de determinar si los actos de una rama de gobierno exceden su autoridad constitucional. Véase Noriega Rodríguez v. Hernández Colón, ante; Silva v. Hernández Agosto, 118 D.P.R. 45 (1986); y Santa Aponte v. Secretario del Senado, 105 D.P.R. 750 (1977). A esos efectos claramente hemos expresado que la "Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales". Véase: Santa Aponte v. Secretario del Senado, ante.[22]

Con dicho principio como norte, en Santa Aponte v. Secretario del Senado, ante, asumimos jurisdicción y dispusimos que el Senado --aun cuando goza del poder constitucional exclusivo para decidir si ordena un recuento de votos respecto a un senador cuya elección se ha cuestionado-- viene en la obligación de permitir que el senador electo disfrute de todas las prerrogativas de su

---

[22] De hecho, que conozcamos este Tribunal nunca ha aplicado la doctrina de cuestión política a un caso ante su consideración. Esta sería la primera vez que se hiciera en la historia jurídica de este País.

cargo hasta tanto culmine el proceso de recuento de votos y se determine finalmente quién obtuvo la mayoría de éstos.

Por otro lado, en Silva v. Hernández Agosto, ante, luego de resolver que la doctrina de cuestión política no era aplicable, intervinimos en el proceso de reglamentación interna de la Asamblea Legislativa, y resolvimos que cierta regla que versaba sobre los procesos investigativos y deliberativos de la Comisión de lo Jurídico del Senado infringía los derechos constitucionales de los representantes de las minorías.

Por último, en Noriega Rodríguez v. Hernández Colón, ante, citando con aprobación los casos previamente señalados y luego de rechazar la aplicación de la doctrina de cuestión política, procedimos a "delinear los contornos que la Constitución de Puerto Rico le confirió a las Ramas Legislativas y Ejecutiva con respecto a los poderes de cada una de hacer y de poner en vigor las leyes". (Énfasis suplido.)

Dicho de otra manera, en los antes citados casos y no obstante la supuesta "existencia" de la doctrina de cuestión política en nuestra jurisdicción, intervinimos directamente con poderes y reglamentos de la Asamblea Legislativa; procedimos a delinear procedimientos a seguir por ésta; a anular reglamentos internos promulgados por dicha Legislatura; y a precisarle los parámetros de sus poderes.

Cabe preguntarse: ¿qué nos impide ahora ordenarle a la Asamblea Legislativa a que cumpla con las claras disposiciones de una ley y, sobre todo, con el mandato claro y específico del pueblo de Puerto Rico?

III

Analizadas las circunstancias presentes en el caso hoy ante nuestra consideración y la jurisprudencia antes citada, no albergamos duda alguna de que la doctrina de cuestión política --la cual, repetimos, nunca hemos aplicado-- no constituye impedimento para que este Tribunal atienda y se exprese sobre la controversia aquí planteada.

Coincidimos con los peticionarios respecto a que la Asamblea Legislativa, al negarse a respetar el mandato del pueblo se colocó al margen de la Constitución y que este Tribunal, como máximo interprete de la Constitución, viene obligado a vindicar los derechos del pueblo mediante la correcta y única interpretación de las disposiciones jurídicas en controversia; de lo contrario, estaríamos abdicando nuestra función ineludible de interpretar "la Constitución y [de] velar que el espíritu y el esquema democrático de esta Carta no se vulnere". Silva v. Hernández Agosto, ante.

Por entender que así actúa la Mayoría, es que disentimos.

FRANCISCO REBOLLO LÓPEZ
Juez Asociado